IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-34

 No. 438A19

 Filed 16 April 2021

 IN THE MATTER OF: G.B., M.B., and A.O.J.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 7

 August 2019 by Judge Monica M. Bousman in District Court, Wake County. This

 matter was heard in the Supreme Court on 13 January 2021.

 Mary Boyce Wells, Office of the Wake County Attorney, for petitioner-appellee
 Wake County Human Services.

 Michelle FormyDuval Lynch and Reginald O’Rourke for appellee guardian ad
 litem.

 Robert W. Ewing for respondent-appellant mother.

 Sean Paul Vitrano for respondent-appellant father.

 MORGAN, Justice.

¶1 Respondent-mother and respondent-father appeal from the trial court’s order

 terminating their parental rights to their minor children M.B. (Mark), who was born

 in November 2013, and G.B. (Gail), who was born in July 2016. Respondent-mother

 also appeals from the portion of the same order which terminated her parental rights

 to her minor daughter from a previous relationship, A.O.J. (Ann), who was born in

 December 2005.1 Ann’s father is not a party to this appeal. After careful review, we

 1 Pseudonyms are used to protect the identities of the juveniles and for ease of reading.
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 conclude that the trial court properly adjudicated at least one ground for termination

 and did not abuse its discretion in determining that termination of respondents’

 parental rights was in the children’s best interests. Accordingly, we affirm the

 termination of parental rights order.

 I. Factual Background and Procedural History

¶2 In November 2016, all three children were living with respondents. On 30

 November 2016, respondent-father became incarcerated and remained in this

 capacity throughout the proceedings in this case. After respondent-father’s

 incarceration, respondent-mother became involved in a romantic relationship with

 Deyonte Galloway, a nineteen-year-old with several felony convictions on his record.

¶3 In April 2017, officers with the Fuquay-Varina Police Department found Mark,

 who was three years old at the time, wandering outside alone and only wearing a

 diaper. After investigating this circumstance by going door-to-door in the

 neighborhood, the officers located respondent-mother’s home. When questioned,

 respondent-mother responded that no one in the home had realized that Mark was

 outdoors. Between April and June 2017, Mark experienced several injuries, including

 three black eyes and bruising that appeared to have been made by fingers. On 5 June

 2017, Mark suffered a broken arm, but respondent-mother did not seek care for her

 son until two days later. After Mark received a cast for the broken limb on 7 June

 2017, respondent-mother left Mark in the bathtub, causing the cast to get wet and
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 requiring a new cast to be created for Mark’s arm on the following day.

¶4 At some point, petitioner Wake County Human Services (WCHS) received

 reports that respondent-mother and Galloway had substance abuse issues and that

 they engaged in domestic violence in the presence of the children, including incidents

 that left holes in the walls of respondent-mother’s home and other occasions during

 which Galloway damaged respondent-mother and Ann’s cellular telephones to

 prevent them from contacting help. In August 2017, respondent-mother tested

 positive for cocaine and marijuana; in another instance, respondent-mother refused

 to provide a hair sample for a drug screen after having admitted that she had

 previously used urine obtained from Ann in order to favorably affect her drug screen

 results. WCHS also received reports that respondent-mother (1) had thrown a shoe

 at Mark, striking his head; (2) had been moving the children from hotel to hotel along

 with Galloway—a known gang member with multiple outstanding arrest warrants—

 in order to avoid Galloway’s arrest; (3) was verbally abused by Galloway when she

 made telephone calls; and (4) failed to use a voucher that she received to obtain free

 eyeglasses for Ann, who is legally blind as a result of a degenerative eye disease.

¶5 On 13 October 2017, WCHS filed a petition alleging that Gail, Mark, and Ann

 were abused and neglected juveniles. A nonsecure custody order was entered by the

 trial court on the same date. On 20 October 2017, an amended petition was filed

 which added allegations regarding (1) a sexual assault committed against Ann by
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 Galloway’s brother and (2) respondent-mother’s use of Ann to provide urine samples

 for respondent-mother’s drug screen. Pursuant to the trial court’s nonsecure custody

 order, Mark and Gail were placed with their paternal grandparents and Ann was

 placed in foster care. At an adjudication hearing held on 14 November 2017,

 respondents entered into a consent order in which they admitted that all three

 children were neglected juveniles and that Mark was an abused juvenile in that “the

 child’s parent, guardian, custodian or caretaker has inflicted or allowed to be inflicted

 on the child a serious physical injury by other than accidental means and has created

 or allowed to be created a substantial risk of physical injury by other than accidental

 means.”

¶6 Respondent-mother agreed to a case plan under which she would (1) have

 supervised visitation with the children for one hour per week, (2) obtain and maintain

 safe, stable housing for herself and her children, (3) not allow Galloway in the vicinity

 of her children, (4) obtain and maintain legal and sufficient income for herself and

 her children, (5) provide documentation to verify her income once a month, (6)

 complete a psychological evaluation and comply with any resulting recommendations,

 (7) complete a substance abuse assessment and comply with any resulting

 recommendations, (8) submit to random drug screens upon the request of WCHS and

 treatment providers, (9) complete a parenting education program and demonstrate

 skills and lessons learned, (10) complete a domestic violence assessment and any
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 program or services which were recommended, and (11) successfully complete a non-

 offending caregiver program and demonstrate lessons learned. Under his own case

 plan, respondent-father agreed to (1) establish legal paternity of Mark, (2) complete

 a substance abuse assessment and comply with all resulting recommendations, (3)

 submit to random drug screens upon the request of WCHS and treatment providers,

 (4) complete a mental health assessment and comply with all resulting

 recommendations, (5) obtain and maintain safe, stable housing, and (6) maintain

 lawful income sufficient to meet the needs of his family and provide monthly

 verification of it to WCHS.

¶7 At a review hearing in February 2018, respondent-mother represented that

 she was living with an aunt in Holly Springs and that she was no longer in a

 relationship with Galloway. However, family members reported that respondent-

 mother had simply left her belongings with the aunt and was not actually staying in

 the aunt’s home. In addition, respondent-father, who had been scheduled for release

 from incarceration in March 2018, had been charged with illegally possessing a

 cellular telephone while incarcerated, had received an additional 11-23 months of

 active time, and had subsequently lost his right to visitation with Mark and Gail.

 Furthermore, the children’s maternal grandmother, with whom Mark and Gail had

 been living, had reported to WCHS that the grandmother needed medical treatment

 due to her cancer diagnosis and could not provide further care for the children at the
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 time. Consequently, Mark and Gail were placed with foster parents. All three

 children were reported to be doing well in their respective foster placements.

¶8 At a subsequent permanency planning review hearing in August 2018, the trial

 court found that respondent-mother was unemployed and living with her mother.

 Respondent-mother had also been charged with possession of marijuana, possession

 of drug paraphernalia, and carrying a concealed weapon after being discovered

 engaging in sexual activity in a car with Galloway in June 2018. When a WCHS social

 worker interviewed respondent-mother about the incident, respondent-mother was

 untruthful, stating that she had been pulled over in a friend’s car while alone in the

 vehicle. Respondent-father had been transferred to Mountain View Correctional

 Institution (MVCI) in June 2018 upon having received six infraction reports while

 incarcerated at his previous penal facility, Franklin Correctional Center.

 Respondent-father was transferred again in August 2018, going to Avery-Mitchell

 Correctional Institution. While at this facility, he received numerous infractions for

 disobeying orders, obtaining tattoos, assaulting and threatening staff, and making

 false accusations.

¶9 At a February 2019 permanency planning review hearing, the trial court found

 that respondent-mother continued to test positive for the presence of impairing

 substances and continued to be involved with Galloway, who attended at least one

 visitation with the children in violation of the visitation agreement. The case’s
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 guardian ad litem (GAL) recommended that the primary plan become adoption

 because the children could not return to the care of respondents within a reasonable

 time, noting that since the previous permanency planning hearing, respondent-father

 had received twelve infractions while incarcerated and had advised the social worker

 that he was going “to continue to receive infractions.” The trial court changed the

 children’s primary plan to adoption.

¶ 10 On 22 March 2019, WCHS filed a motion to terminate the parental rights of

 both respondents, alleging the existence of the following grounds: (1) neglect, (2) that

 respondents “willfully left the juvenile[s] in foster care for more than twelve months

 without showing to the satisfaction of the court that reasonable progress had been

 made in correcting the conditions that led to the removal of the” children, and (3) that

 the children had been in the custody of WCHS during which respondents, for a period

 of six months preceding the filing of the motion, willfully failed for such period “to

 pay a reasonable portion of the cost of the care for the [children] although physically

 and financially able to do so.” See N.C.G.S. § 7B-1111(1), (2), and (3) (2019). A hearing

 on the motion to terminate the parental rights of both respondents was held in June

 2019, by which time the children had been in the custody of WCHS for more than

 eighteen months. After the hearing, the trial court found the existence of all three

 alleged grounds to terminate the parental rights of each respondent. The trial court

 went on to conclude that termination of both respondents’ parental rights was in the
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 best interests of the children. Both respondents appeal from the order terminating

 their respective parental rights.

 II. Standards of Review

¶ 11 When considering a petition to terminate parental rights, the trial court must

 first adjudicate the existence of the grounds for termination which have been alleged.

 See N.C.G.S. § 7B-1109 (2019). “At the adjudicatory stage, the petitioner bears the

 burden of proving by ‘clear, cogent, and convincing evidence’ the existence of one or

 more grounds for termination under section 7B-1111(a) of the General Statutes.” In re

 A.U.D., 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f)). This Court reviews a

 trial court’s adjudication of the existence of grounds to terminate parental rights in

 order “to determine whether the findings are supported by clear, cogent and

 convincing evidence and the findings support the conclusions of law.” In re E.H.P.,

 372 N.C. 388, 392 (2019) (quoting In re Montgomery, 311 N.C. 101, 111 (1984)). All

 findings of fact which are not challenged by a respondent are binding on appeal. In re

 T.N.H., 372 N.C. 403, 407 (2019) (citing Koufman v. Koufman, 330 N.C. 93, 97 (1991)).

 “The trial court’s conclusions of law are reviewable de novo on appeal.” In re C.B.C.,

 373 N.C. 16, 19 (2019).

¶ 12 If the trial court finds that at least one ground to terminate parental rights

 under N.C.G.S. § 7B-1111(a) exists, “it then proceeds to the dispositional stage,” In re

 A.U.D., 373 N.C. at 6, at which it “determine[s] whether terminating the parent’s
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 rights is in the juvenile’s best interest.” N.C.G.S. § 7B-1110(a) (2019). In making that

 determination, the trial

 court shall consider the following criteria and make written
 findings regarding the following that are relevant:
 (1) The age of the juvenile.
 (2) The likelihood of adoption of the juvenile.
 (3) Whether the termination of parental rights will
 aid in the accomplishment of the permanent plan for
 the juvenile.
 (4) The bond between the juvenile and the parent.
 (5) The quality of the relationship between the
 juvenile and the proposed adoptive parent,
 guardian, custodian, or other permanent placement.
 (6) Any relevant consideration.

 Id. § 7B-1110(a). In reviewing a trial court’s dispositional determination, we evaluate

 the trial court’s conclusion that a termination of parental rights would be in the best

 interests of the child under an abuse of discretion standard. In re E.H.P., 372 N.C.

 388, 392 (2019). “Abuse of discretion results when the court’s ruling is manifestly

 unsupported by reason or is so arbitrary that it could not have been the result of a

 reasoned decision.” In re Z.L.W., 372 N.C. 432, 435 (2019).

 III. Respondent-father’s Appeal

¶ 13 Respondent-father contends that the trial court erred both in finding the

 existence of at least one ground for the termination of his parental rights to Mark and

 Gail and in determining that the termination of his parental rights would be in the

 children’s best interests. We disagree with both contentions.

 A. Adjudication
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

¶ 14 Respondent-father first challenges the trial court’s conclusion that the ground

 existed to terminate his parental rights to Mark and Gail based upon his willful

 failure to make reasonable progress in correcting the circumstances that led to their

 removal from respondent-mother’s home. See N.C.G.S. § 7B-1111(a)(2) (“The parent

 has willfully left the juvenile in foster care or placement outside the home for more

 than 12 months without showing to the satisfaction of the court that reasonable

 progress under the circumstances has been made in correcting those conditions which

 led to the removal of the juvenile.”). We conclude that the trial court did not err in

 finding the existence of this ground for the termination of respondent-father’s

 parental rights.

¶ 15 Respondent-father argues that the trial court erroneously considered the

 circumstance of his incarceration in two ways: by finding that his incarceration was

 a factor that caused his children to be placed in foster care and by failing to take into

 account the limitations that incarceration imposed upon respondent-father’s ability

 to comply with his case plan. Respondent-father notes that he was incarcerated at

 the time that the children were taken into WCHS custody and asserts that the

 conditions which led to the children being taken into the custody of WCHS were

 substance abuse, domestic violence, and failure to address medical needs—conditions

 created or caused by respondent-mother and Galloway, and thus unrelated to

 respondent-father’s incarceration. Respondent-father further contends that “the
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 court was obligated to consider the limitations the incarceration imposed on his

 ability to comply with the case plan, as well as other relevant factors.”

¶ 16 We do not subscribe to respondent-father’s view of these considerations. To the

 contrary, our review of the case reveals that the trial court carefully considered

 evidence about respondent-father’s ability to achieve his case plan requirements

 despite his incarceration, as well as the impact of respondent-father’s acts and

 decisions while incarcerated, in making its findings of fact and ultimately in

 determining that respondent-father had failed to make reasonable progress.

¶ 17 While “[a] parent’s incarceration is a circumstance that the trial court must

 consider in determining whether the parent has made reasonable progress toward

 correcting those conditions which led to removal of the juvenile,” In re C.W., 182 N.C.

 App. 214, 226 (2007) (quotation marks omitted), “incarceration, standing alone,

 neither precludes nor requires finding the respondent willfully left a child in foster

 care.” In re Harris, 87 N.C. App. 179, 184 (1987). Here, the trial court observed that

 respondent-father was incarcerated when the children were removed from

 respondent-mother’s home and recognized it as an occurrence which resulted in the

 children’s placement in foster care. However, the trial court did not rely upon the fact

 of respondent-father’s incarceration, standing alone, to conclude that the children

 needed to be placed in foster care or that respondent-father had failed to make

 reasonable progress. Concomitantly, the trial court did not ignore the impact of
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 respondent-father’s incarceration in assessing his ability to follow his case plan and

 to make reasonable progress through compliance with it.

¶ 18 In our view, the trial court properly considered evidence regarding respondent-

 father’s initial incarceration at the time that the children were removed from the

 home and properly evaluated areas in which respondent-father made some progress

 on his case plan—such as his attenuated attendance at Narcotics Anonymous

 meetings and his attainment of several negative drug screens—along with

 respondent-father’s unfortunate choices and actions while incarcerated which were

 demonstrably detrimental to respondent-father’s ability to complete his case plan.

 Such choices and actions resulted in a lengthy delay in respondent-father’s projected

 release date from incarceration and significantly limited his access to classes,

 programs, services, and employment which directly related to his case plan. For

 example, the trial court specifically found that:

  respondent-father, at the time of the filing of the petition, “was housed in a
 local facility” and had a projected release date within three to four months;

  respondent-father had the opportunity to work in a job at the sign plant
 which would have allowed him to earn money to aid in the care of his
 children and which would have earned him “gain time” to push forward his
 release date, but despite the ability to do the job, respondent-father chose
 to forego the opportunity because he did not want the job;

  respondent-father “received nineteen infractions during his incarceration”
 and “was placed in restricted confinement six times” as a result;

  respondent-father, having been relocated to a different correctional facility
 due in some measure to his infractions of penal rules, was unable to enroll
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 in desired classes, which would have reduced the period of incarceration
 which he was required to serve;

  respondent-father, at the time of the termination hearing, was held in
 solitary confinement by his own request following the stabbing of
 respondent-father by gang members;

  respondent-father had tattoos identifying him as a gang member although
 he denied being actively involved in a gang;

  respondent-father’s “lengthy incarceration limited his ability to participate
 in the services necessary to put him in a position to reunify with his
 children”;

  respondent-father illegally obtained a cellular telephone while incarcerated
 which resulted in an additional sentence, extending his potential release
 date; and

  respondent-father’s “repeated criminal activity and other decision making”
 in prison “resulted in his absence from his children’s lives for at least
 sixteen months longer than anticipated at the time of adjudication.”

¶ 19 The dissent prefers to cast a view which diminishes the harmful impact upon

 the children of the last two cited findings of fact which the trial court made regarding

 the elongation of respondent-father’s time of incarceration due to the parent’s

 voluntary choices. The dissent endeavors to buttress this stance by isolating

 respondent-father’s cellular telephone offense to the exclusion of respondent-father’s

 other deleterious decisions, while incorrectly elevating the role of this conviction

 among the plentiful considerations which resulted in the termination of respondent-

 father’s parental rights. However, “the best interests of the juvenile are of paramount

 consideration by the court and . . . when it is not in the juvenile’s best interest to be
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 returned home, the juvenile will be placed in a safe, permanent home within a

 reasonable amount of time.” N.C.G.S. § 7B-100(5) (emphasis added); see also In re

 N.G., 374 N.C. 891, 907 (2020).

¶ 20 In his appeal to this Court, respondent-father has acknowledged the negative

 effect of his relocation from Franklin Correctional Center—a facility where he was

 able to receive drug screens, participate in Narcotics Anonymous, and have access to

 an approved parenting program in pursuit of the satisfactory completion of his case

 plan—to MVCI, the facility to which he was transferred upon his aggregation of

 infractions and where the above-referenced opportunities were either unavailable or

 more difficult to obtain. Also, respondent-father did not complete a mental health

 assessment, which was another element of his case plan, in part because once he was

 transferred to MVCI respondent-father was “mostly in isolation” and often could not

 receive visits, even from a mental health professional. Further, the trial court

 disapproved of visits between respondent-father and the children at MVCI because

 of the distance that the children would have to travel.

¶ 21 We agree with respondent-father that his ability to comply with his case plan

 was hampered by his movement to certain penal institutions and the limited options

 offered by those institutions to fulfill his case plan, as opposed to those more plentiful

 resources which were available at the facilities to which he was previously assigned.

 There were also restrictions on programs made available to respondent-father due to
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 his specific incarceration status. However, the evidence in this case shows that

 respondent-father chose to engage in activities during his incarceration which created

 these obstacles for him and also decided to reject beneficial opportunities which were

 made available to him. Respondent-father himself constructed the very barriers to

 the achievement of his case plan goals about which he now complains. Accordingly,

 we determine that there is no error in the trial court’s findings of fact regarding

 respondent-father’s failures in accomplishing his case plan, most of which resulted

 from circumstances for which respondent-father was responsible.

¶ 22 In sum, respondent-father repeatedly elected to engage in behaviors which

 significantly extended his incarceration, greatly limited his options, and frequently

 eliminated his opportunities, thus rendering him unavailable as a potential

 placement for Mark and Gail and also eradicating his prospect of visits with the

 children. These findings of fact which are supported by the evidence in turn support

 the ultimate determination by the trial court that respondent-father failed to make

 reasonable progress on his case plan. As such, we affirm the trial court’s conclusion

 that the ground existed to terminate respondent-father’s parental rights for failure

 to make reasonable progress under the circumstances in correcting the conditions

 that led to removal pursuant to N.C.G.S. § 7B-1111(a)(2). Because the existence of

 only one ground as identified by N.C.G.S. § 7B-1111 is required to support

 termination of parental rights, we do not address respondent-father’s arguments as
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 to the remaining two additional grounds for termination of his parental rights which

 were found by the trial court.

 B. Disposition

¶ 23 Respondent-father argues that the trial court abused its discretion in

 determining that termination of respondent-father’s parental rights was in the best

 interests of the juveniles Mark and Gail. Specifically, respondent-father asserts that

 “in light of [his] imminent completion of his sentence, the skills he had acquired in

 prison, his ability and desire to support the children, and his interest in remaining

 their father, termination was contrary to their best interests.” This assertion is

 unpersuasive.

¶ 24 The dissenting view takes sweeping liberties to construct its conclusion that

 this Court affirms the trial court’s order which terminates the parental rights of

 respondent-father merely because he is incarcerated. In creating this narrative, the

 dissent has devised propositions that are conclusory, deduced theories that are

 illusory, and ultimately developed positions that are contradictory. Although the

 opposing opinion characterizes our decision as being premised solely upon

 respondent-father’s incarceration, a deeper analysis demonstrates that respondent-

 father’s voluntary failure to fulfill the requirements of his case plan and his repeated

 unwillingness to engage in identified available opportunities consistent with his case

 plan are the overarching components in his failure to make reasonable progress
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 under the circumstances in correcting the conditions that led to removal of the

 children from the home.

¶ 25 Due to being riveted by respondent-father’s incarceration, and combined with

 this Court’s determination that the ground of failure to make reasonable progress

 was sufficiently proven to exist at the trial level, so as to lead to termination of

 respondent-father’s parental rights, the dissent unfortunately conflates its perceived

 view that termination of respondent-father’s parental rights occurred because he was

 incarcerated with our actual view that respondent-father failed to make reasonable

 progress and the trial court concluded that it was in the children’s best interests to

 terminate respondent-father’s parental rights because he consistently engaged in

 activities on a voluntary basis while incarcerated which inhibited his ability to satisfy

 his case plan and consequently experienced negative consequences for his negative

 behavior which further compromised his opportunities to fulfill his case plan.

 Although respondent-father happened to be incarcerated as these circumstances

 were transpiring, his lack of freedom did not uniquely distinguish him from parents

 with court-ordered case plans who are not incarcerated who likewise consistently

 engage in activities on a voluntary basis which inhibit their abilities to satisfy their

 respective case plans, consequently experience negative consequences for their

 negative behavior, and ultimately have their parental rights terminated as a result.

¶ 26 “Incarceration, standing alone, is neither a sword nor a shield in a termination
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 of parental rights decision.” In re M.A.W., 370 N.C. 149, 153 (2017) (quoting In re

 P.L.P., 173 N.C. App. 1, 10 (2005), aff’d per curiam, 360 N.C. 360 (2006)) (citation

 omitted); see also In re T.N.H., 372 N.C. at 412; see also In re S.D., 374 N.C. 67, 75

 (2020). While the dissent attempts to cast our decision to affirm the trial court’s order

 terminating respondent-father’s parental rights as an outcome which utilizes

 respondent-father’s incarceration as a sword against him, it is ironic that the dissent

 in the present case trumpets the employment of respondent-father’s incarceration

 alone as a shield to protect him from the adverse consequences of his failure to

 satisfactorily complete his case plan.

¶ 27 As noted previously, a trial court’s decision to terminate parental rights is

 reviewed only for abuse of discretion. Respondent-father does not take issue with the

 analysis employed here by the trial court but only accentuates that he was scheduled

 to be released shortly after the end of the termination of parental rights hearing, that

 he had plans for housing and employment upon his release, and that he had a strong

 desire to maintain his relationship with his children. While we acknowledge

 respondent-father’s desire to retain his parental rights, he has not demonstrated that

 the trial court’s disposition was “manifestly unsupported by reason or . . . so arbitrary

 that it could not have been the result of a reasoned decision.” In re Z.L.W., 372 N.C.

 at 435. Therefore, we affirm the trial court’s order terminating respondent-father’s

 parental rights.
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 IV. Respondent-mother’s Appeal

¶ 28 Respondent-mother challenges only the trial court’s dispositional

 determination that termination of her parental rights was in the children’s best

 interests. Specifically, she notes that “this Court stated in a . . . recent opinion that

 the abuse of discretion standard of review applies on appeal when determining if

 termination of parental rights is in the best interests of the child,” citing In re D.L.W.,

 368 N.C. 835, 842 (2016). However, respondent-mother contends that “this Court

 [should] apply a de novo standard of review for the legal conclusion that termination

 of parental rights is in a child’s best interest since a trial court is required to make

 certain written findings of fact to support its conclusion of law.” We disagree with this

 assertion.

¶ 29 Respondent-mother cites our decision in Carolina Power & Light Co. v. City of

 Asheville, 358 N.C. 512, 517 (2004) for the proposition that “[c]onclusions of law

 drawn by the trial court from its findings of fact are reviewable de novo on appeal.”

 She then asserts that because N.C.G.S. § 7B-1110 was amended in 2011 to require

 trial courts at the disposition stage to consider the criteria enumerated in N.C.G.S.

 § 7B-1110(a), which we previously referenced, and to make written findings

 regarding those criteria that are relevant in any case, an appellate court should

 conduct de novo review of a trial court’s best interests determination instead of

 utilizing an abuse of discretion standard. However, respondent-mother cites no
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 authority to support her argument and further fails to address any of the numerous

 cases decided by this Court in which we have applied an abuse of discretion standard

 at the disposition stage of a termination of parental rights case. See, e.g., In re D.L.W.,

 368 N.C. at 842; In re L.M.T., 367 N.C. 165, 171 (2013). Decades ago, this Court in In

 re Montgomery designated the trial court’s determination at the disposition stage of

 a termination of parental rights hearing as discretionary. 311 N.C. 101, 108 (1984)

 (“[W]here there is a reasonable hope that the family unit within a reasonable period

 of time can reunite and provide for the emotional and physical welfare of the child,

 the trial court is given discretion not to terminate rights.” (emphasis added)). At no

 point during this interim time period, including the 2011 amendment raised by

 respondent-mother, has the Legislature chosen to amend the pertinent statute to

 alter our holding in In re Montgomery by explicitly establishing a de novo standard

 of review at the disposition stage of a termination of parental rights proceeding. See

 Raeford Lumber Co. v. Rockfish Trading Co., 163 N.C. 314, 317 (1913) (holding that

 we presume that the Legislature acts with full knowledge of prior and existing law

 and its construction by the courts.).

¶ 30 More recently, in In re C.V.D.C., 374 N.C. 525 (2020), we considered and

 rejected the exact argument advanced here by respondent-mother “regarding the

 appropriate standard of appellate review for a disposition entered under N.C.G.S. §

 7B-1110(a).” Id. at 528–29 (discussing but declining to accept a respondent-parent’s
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

 assertion that de novo review is appropriate at the disposition stage based upon the

 respondent-parent’s contention that “our deferential posture [is] a vestige of such

 decisions as In re Montgomery, . . . which predate the amendments to N.C.G.S. § 7B-

 1110(a) enacted by the legislature in 2005 and 2011 to safeguard the rights of

 parents”). See also In re Z.L.W., 372 N.C. at 435 (“The trial court’s assessment of a

 juvenile’s best interest at the dispositional stage is reviewed only for abuse of

 discretion.”). As in that case, “we again reaffirm our application of the abuse of

 discretion standard when reviewing the trial court’s determination of ‘whether

 terminating the parent’s rights is in the juvenile’s best interest’ under N.C.G.S. § 7B-

 1110(a).” In re C.V.D.C., 374 N.C. at 529; see also In re K.S.D-F., 375 N.C. 626, 636

 (2020) (citing In re C.V.D.C. for the proposition that an “argument that each of the

 N.C.G.S. § 7B-1110(a) factors weighs against termination in this matter when

 reviewed under a de novo standard cannot prevail”).

¶ 31 In the present case, where the trial court made specific findings regarding the

 relevant criteria identified in section 7B-1110 and where respondent-mother has not

 argued that the dispositional determination of the trial court is not “manifestly

 unsupported by reason or is so arbitrary that it could not have been the result of a

 reasoned decision,” In re Z.L.W., 372 N.C. at 435, we hold that the trial court did not

 abuse its discretion under N.C.G.S. § 7B-1110(a). We therefore affirm the order of the

 trial court terminating respondent-mother’s parental rights.
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Opinion of the Court

AFFIRMED.
 Justice EARLS dissenting.

¶ 32 Respondent-father was incarcerated and his two children were in the custody

 of their mother when the events occurred which led to the children being adjudicated

 abused and neglected and taken into care in October 2017. He was still incarcerated

 when the trial court held hearings on 5, 6 and 27 June 2019 on the petition for

 termination of parental rights, although the trial court made a finding that he was

 due to be released “in late July 2019.” Publicly available records indicate respondent

 was indeed released from custody on 26 July 2019 and he was therefore no longer in

 prison by the time the trial court entered its order terminating his parental rights on

 7 August 2019. The trial court’s findings of fact as they relate to respondent-father

 do not support the conclusion that he failed to make reasonable progress in correcting

 the conditions that led to the children being taken into care and his parental rights

 should not be terminated on that basis. Instead, the majority makes its own findings.

 North Carolina is not a jurisdiction which provides for the termination of parental

 rights merely because a parent is incarcerated. The trial court’s order should be

 reversed as to respondent-father.

¶ 33 States vary widely in how incarceration of a parent impacts the determination

 of whether a parent’s rights to a child should be terminated. See Steven Fleischer,

 Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29

 Seton Hall L. Rev. 312, 325 (1998) (categorizing state statutes). See also Stuart M.

 Jones, Not Perfect, but Better than Most: South Carolina's TPR Process and Its
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 Surprisingly Fair Treatment of Incarcerated Parents, 62 S.C. L. Rev. 697, 700 (2011)

 (“By 2005, TPR statutes in thirty-six states listed a parent’s incarceration as an

 element to be considered in a TPR proceeding. Twenty-five of these states use the

 length of the parent’s prison sentence as a determining factor in whether

 incarceration is grounds for a TPR action. Some of these states specify exactly how

 long a parent must be imprisoned, while others speak in broader terms.”).

¶ 34 Some states allow incarceration as a ground for the termination of parental

 rights. See, e.g., Alaska Stat. § 47.10.080 (o)(1) (2020) (incarceration may be a

 sufficient ground for termination if the term of incarceration is “significant” in light

 of the child’s age and need for adult supervision); Colo. Rev. Stat. § 19-3-604(b)(III)

 (2020) (permitting termination of parental rights if the parent will be incarcerated

 for more than six years from the date the child was adjudicated dependent or

 neglected); Ky. Rev. Stat. Ann. §§600.020(2)(b), 610.127(1) (2021) (reasonable efforts

 to reunify a child do not need to be made when parent will be incarcerated for more

 than a year beyond the date the child is taken into care); N.D. Cent. Code § 27-20-02

 (2021) (reasonable efforts to reunify a family not necessary if a parent is incarcerated

 for a specific length of time measured by the child’s age). Other states only allow

 incarceration for certain offenses to be a ground for termination of parental rights.

 See, e.g., Ind. Code §§ 31-35-3, -4 (2021) (a conviction for certain crimes, including

 murder, involuntary manslaughter, or rape, can be grounds for termination of
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 parental rights).

¶ 35 On the other end of the spectrum are states with statutes that specifically say

 that incarceration alone is not a basis for termination of parental rights. See, e.g.,

 Mass. Gen. Laws ch. 210, § 3(c)(xiii) (2021) (“Incarceration in and of itself shall not

 be grounds for termination of parental rights;”); Mo. Laws § 211.447(7)(6) (2020)

 (same); Neb. Rev. Stat. § 43-292.02(2)(b) (2021) (state shall not file petition for

 termination of parental rights if the sole basis for the petition is that the parent or

 parents are incarcerated). Other states have specifically created statutory exceptions

 to the general time limits on how long reasonable efforts must be made to reunify a

 family when a parent is incarcerated. See, e.g., Colo. Rev. Stat. § 19-3-604(2)(k)(IV)

 (2020); N.M. Stat. Ann. § 32A-4-29(G)(9) (2021).

¶ 36 What matters for this case is that the North Carolina General Assembly has

 not provided for incarceration as a ground for termination of parental rights.

 Therefore it is inappropriate for this Court to create such a basis. Yet that is precisely

 what the majority opinion effectively accomplishes through the back door of basing

 termination here on respondent-father’s decisions “to engage in behaviors which

 significantly extended his incarceration, greatly limited his options, and frequently

 eliminated his opportunities, thus rendering him unavailable as a potential

 placement for Mark and Gail and also eradicating his prospect of visits with the

 children.” These statements are equally true of every parent who is incarcerated, and
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 cannot, under North Carolina law, support a determination that the incarcerated

 parent should lose their parental rights.

¶ 37 This legal error is compounded by the majority’s willingness to find its own

 facts where the trial court’s order is deficient. Our task when reviewing a trial court’s

 order terminating the rights of a parent to their child is “to determine whether the

 findings are supported by clear, cogent, and convincing evidence and the findings

 support the conclusions of law.” In re K.H., 375 N.C. 610, 612 (2020) (quoting In re

 Z.A.M., 374 N.C. 88, 94 (2020)). The majority’s opinion goes beyond this task and

 supplements the trial court’s order with new factual findings. The trial court’s

 findings do not support its ultimate conclusion that respondent-father willfully failed

 to make reasonable progress to correct the conditions leading to his children’s

 removal from their home. As a result, this is not a legally permissible ground for

 termination of respondent’s parental rights in this case.

¶ 38 Respondent-father was incarcerated on 30 November 2016. Almost a year

 later, while he was serving his sentence, Mark and Gail were removed from the home

 of respondent-mother and her boyfriend because, as the trial court found, “the

 children were exposed to domestic violence” perpetrated by the boyfriend against

 respondent-mother, respondent-mother’s boyfriend had intentionally injured Mark,

 Mark’s medical needs “were not being met in a timely manner,” respondent-mother

 and her boyfriend “were engaged in substance abuse,” and respondent-father was in
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 prison. Plainly, the only circumstance identified by the trial court that pertained to

 respondent-father—rather than to respondent-mother and her abusive boyfriend—

 and resulted in the children’s removal from the home was that respondent-father was

 incarcerated.

¶ 39 As the majority notes, respondent-father subsequently entered into a case plan

 with Wake County Human Services which required him to (1) establish legal

 paternity of Mark, (2) complete a substance abuse assessment and comply with

 recommendations, (3) submit to random urine and hair sample drug screens, (4)

 complete a mental health assessment and comply with any recommendations, (5)

 obtain and maintain safe, stable housing, and (6) obtain and maintain lawful income

 sufficient to meet the needs of his family and provide monthly verification of the

 same.

¶ 40 The trial court’s findings do not establish that respondent-father failed to

 comply with this case plan. See In re A.J.P., 375 N.C. 516, 525 (2020) (“[P]arental

 compliance with a judicially adopted case plan is relevant in determining whether

 grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2) . . . as long as the

 objectives sought to be achieved by the case plan” address the circumstances that

 resulted in the children’s removal from the home.). Rather than finding that

 respondent-father did not comply with his case plan, the trial court’s findings

 pertaining to respondent-father focus almost exclusively on the fact of his
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 incarceration. Of eleven factual findings, one (Finding of Fact #31) addresses the fact

 that respondent-father established paternity of Mark, two (Findings of Fact #36 and

 #37) address the fact that respondent-father quit his job while in prison, and the

 remaining eight have to do with respondent-father being incarcerated.

¶ 41 In Finding of Fact #32, the trial court states that respondent-father does not

 make decisions that are in the best interests of his children, which appears to be a

 conclusory finding premised upon the findings which follow it. In Findings of Fact

 #33 and #34, the trial court states that respondent-father has been incarcerated since

 30 November 2016, before the incidents which led to the children’s removal from the

 home, and that he was convicted of illegally possessing a cellphone, which extended

 his release date. In Finding of Fact #35, the trial court states that respondent-father

 wanted to participate in classes that would reduce the amount of time that he was

 incarcerated, but that he “was unable to enroll in classes at the facilities where he

 was housed.” In Findings of Fact #36 and #37, the trial court states that respondent-

 father was able to work, but chose not to, and that respondent-father might have had

 an earlier release date if he chose to work. The trial court stated in Finding of Fact

 #38 that respondent-father had received infractions while incarcerated and that he

 has been placed in solitary confinement “which he reports is by his choice for his own

 protection, as gang members stabbed him in March 2019, when he refused to carry

 out an assault as directed by a higher-ranking gang member in the prison.” In
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 Finding of Fact #39, the trial court found that respondent-father denied active

 involvement in a gang but acknowledged having gang tattoos. In Finding of Fact #40,

 the trial court found that respondent-father had a limited ability to participate in

 services as a result of his lengthy incarceration. Finally, in Finding of Fact #41, the

 trial court found that respondent-father’s decisions resulted in incarceration, and a

 resulting absence from his children’s lives “for at least sixteen months longer than

 anticipated at the time of adjudication.”

¶ 42 The trial court’s order is devoid of findings related to respondent-father’s

 completion of a substance abuse assessment and compliance with any

 recommendations, respondent-father’s submission to random drug screens,

 respondent-father’s completion of a mental health assessment and compliance with

 any recommendations, whether respondent-father had safe and stable housing

 prepared for his pending release from incarceration, or whether respondent-father

 had similarly made plans for obtaining lawful income sufficient to meet the needs of

 his family. The only trial court finding relating directly to respondent-father’s case

 plan states that respondent-father established paternity of Mark, which suggests

 compliance with his case plan. The only other aspect of the case plan which might

 arguably be addressed in the trial court’s findings is the requirement that

 respondent-father obtain and maintain lawful income sufficient to meet the needs of

 his family—the trial court found that respondent-father “would have earned some
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 amount of money while working a job in prison,” but does not find—and indeed, it is

 implausible to assume—that this would have been close to sufficient to meet the

 needs of respondent-father’s children.

¶ 43 The trial court’s findings also fail to establish that respondent-father failed to

 make “reasonable progress under the circumstances . . . in correcting those conditions

 which led to the removal of the juvenile[s].” N.C.G.S. § 7B-1111(a)(2) (2019). A parent

 need not “completely remediate the conditions that led to the children’s removal” nor

 “render herself capable of being reunified with her children” to avoid termination of

 parental rights under N.C.G.S. § 7B-1111(a)(2). In re J.S., 374 N.C. 811, 819–20

 (2020). “Only reasonable progress in correcting the conditions must be shown.” Id. at

 819 (quoting In re L.C.R., 226 N.C. App. 249, 252 (2013)). Further, a trial court “must

 consider” a parent’s incarceration “in determining whether the parent has made

 ‘reasonable progress’ toward ‘correcting those conditions which led to the removal of

 the juvenile.’ ” In re A.J.P., 375 N.C. at 530 (quoting In re C.W., 182 N.C. App. 214,

 226 (2007)).

¶ 44 As noted previously, the children were removed from the home of respondent-

 mother and her boyfriend primarily because respondent-mother and her boyfriend

 exposed the children to domestic violence, substance abuse, and physical abuse and

 failed to address the children’s medical needs. However, a parent in a termination of

 parental rights action cannot be held responsible for the actions of others. Natural
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

parents have a “fundamental liberty interest . . . in the care, custody, and

management of their child” which “does not evaporate simply because they have not

been model parents or have lost temporary custody of their child to the State.”

Santosky v. Kramer, 455 U.S. 745, 753 (1982). In recognition of this interest, this

Court has long held that only the parent’s “conduct inconsistent with the parent’s

protected status” or a finding that the parent is unfit will warrant application of the

best interests of the child standard to award custody to a nonparent over the parent.

Price v. Howard, 346 N.C. 68, 79 (1997); see also Owenby v. Young, 357 N.C. 142, 145

(2003). (“Therefore, unless a natural parent’s conduct has been inconsistent with his

or her constitutionally protected status, application of the ‘best interest of the child’

standard in a custody dispute with a nonparent offends the Due Process Clause of the

United States Constitution.”). This standard of conduct is lower than that warranting

termination of parental rights pursuant to statute. Price, 346 N.C. at 79. It follows,

then, that if a determination that a parent has acted inconsistently with his or her

constitutionally protected status as a parent must be based on the conduct of that

parent, the higher standard of conduct warranting termination of parental rights

cannot be based on the conduct of another, for which the parent would be less

culpable. C.f. In re D.W.P., 373 N.C. 327, 339–40 (2020) (affirming trial court’s

decision to terminate the parental rights of a mother where the facts showed that her

boyfriend likely caused a child’s injuries because the mother re-established a
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 relationship with the boyfriend, hid the relationship from social services, and refused

 “to make a realistic attempt to understand how [the child] was injured or to

 acknowledge how her relationships affect her children’s wellbeing”). Instead, a

 parent’s progress, or lack thereof, in ameliorating the conditions which led to a child’s

 removal must relate to the conditions for which the parent is responsible.

¶ 45 Even assuming that respondent-father could be held responsible for

 ameliorating the conditions which were caused by respondent-mother and her

 boyfriend, the trial court’s findings do not, at any point, reference respondent-father’s

 progress or lack thereof in addressing these circumstances. For example, the trial

 court’s findings do not address respondent-father’s plans for his children after his

 incarceration was to end—whether he planned to shield them from abuse by

 respondent-mother and her boyfriend, whether he had made progress toward being

 capable of addressing their medical needs, or whether he himself was engaging in

 substance abuse or domestic violence. As a result, the trial court’s findings do not at

 all address, with respect to respondent-father, what the trial court found to be the

 principal circumstances that led to the children’s removal, even while the trial court’s

 order terminates respondent-father’s parental rights for failing to correct the

 conditions which led to the children’s removal.

¶ 46 Taken together, the trial court’s findings establish that respondent-father was

 incarcerated and, as a result, not present to care for his children, and that
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 respondent-father possessed a cellphone while incarcerated, which lengthened his

 incarceration. The trial court describes this as “repeated criminal activity and other

 decision making [which] resulted in [respondent-father’s] absence from his children’s

 lives for at least sixteen months longer than anticipated at the time of adjudication.”

 While it may be true that respondent-father’s conduct in prison resulted in a longer

 period of incarceration, I fail to see the justice, much less the legal basis, for

 terminating a father’s rights in his children because he possessed a contraband

 cellphone while incarcerated. In any case, a parent’s incarceration does not by itself

 support a trial court’s decision to terminate the parent’s rights to a child. In re S.D.,

 374 N.C. 67, 75 (2020) (“Incarceration, standing alone, is neither a sword nor a shield

 in a termination of parental rights decision.” (cleaned up)).

¶ 47 The majority, in an attempt to shore up the trial court’s thin basis for

 termination, posits that the trial court neither relied upon respondent-father’s

 incarceration nor ignored it in reaching the determination that respondent-father’s

 rights were subject to termination. The majority reaches this conclusion, however, by

 supplementing the trial court’s order with its own facts. For example, the majority

 writes that the trial court “properly evaluated areas in which respondent-father made

 some progress on his case plan,” referencing attendance at Narcotics Anonymous

 meetings and attaining several negative drug screens. However, neither those facts

 nor any evidence of their consideration appears in the trial court’s order. The majority
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 also states that respondent-father’s “choices and actions . . . significantly limited his

 access to classes, programs, services, and employment which directly related to his

 case plan.” Again, this does not appear in the trial court’s order. Instead, the trial

 court found that respondent-father’s “lengthy incarceration limited his ability to

 participate in the services necessary to put him in a position to reunify with his

 children.” However, this conclusory statement does nothing to support a finding that

 respondent-father willfully failed to complete his case plan. Indeed, the trial court’s

 order makes no reference to the substance abuse, mental health, housing, or income

 needs which were the subject of respondent-father’s case plan. Moreover, while the

 majority seems to have found as a fact that respondent-father was “relocated to a

 different correctional facility” without classes that would have reduced respondent-

 father’s period of incarceration “due in some measure to his infractions of penal

 rules,” such a finding is not contained in the trial court’s order. In fact, the trial court’s

 order does not even suggest, as the majority does, that respondent-father was

 responsible for his inability to participate in classes, stating only that respondent-

 father “wanted to participate in classes” but was “unable to enroll in classes at the

 facilities where he was housed.”

¶ 48 Regardless of the majority’s assertions to the contrary, the trial court here did

 not weigh all of the evidence and come to a reasoned conclusion that, taking into

 account the barriers imposed by respondent-father’s incarceration, respondent-father
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 nevertheless willfully failed to ameliorate the conditions which led to the children’s

 removal from their home despite respondent-father’s ability to do so. Rather, the trial

 court’s findings clearly demonstrate that the trial court terminated respondent-

 father’s parental rights because he was incarcerated and, while incarcerated, delayed

 his release by possessing a cellphone. The trial court made no reference to the

 substance abuse, domestic abuse, physical abuse, and lack of medical care that

 resulted in the children’s removal, likely because those circumstances were not

 attributable to respondent-father. The trial court did not even make reference to

 respondent-father’s case plan, except to note that he had entered into one.

¶ 49 The majority also relies upon “the best interests of the juvenile” in its defense

 of the trial court’s determination that grounds existed to terminate respondent-

 father’s parental rights, citing N.C.G.S. § 7B-100(5) (stating that one purpose of the

 “Abuse, Neglect, Dependency” subchapter of the Juvenile Code is to ensure “that the

 best interests of the juvenile are of paramount consideration by the court”). However,

 in termination of parental rights proceedings, the best interests of the juvenile are

 considered at the dispositional stage. N.C.G.S. § 7B-1110(a) (2019) (“After an

 adjudication that one or more grounds for terminating a parent’s rights exist, the

 court shall determine whether terminating the parent’s rights is in the juvenile’s best

 interest.”). At the adjudicatory stage, the only question for the trial court is whether

 grounds exist to terminate the respondent’s parental rights. N.C.G.S. § 7B-1109(e)
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 (2019) (“The court shall take evidence, find the facts, and shall adjudicate the

 existence or nonexistence of any of the circumstances set forth in G.S. 7B-1111 which

 authorize the termination of parental rights of the respondent.”). See, e.g., In re

 D.L.W., 368 N.C. 835, 842 (2016) (“The procedure for termination of parental rights

 involves a two-step process. In the initial adjudication stage, the trial court must

 determine whether grounds exist pursuant to N.C.G.S. § 7B-1111 to terminate

 parental rights. If it determines that one or more grounds listed in section 7B-1111

 are present, the court proceeds to the dispositional stage, at which the court must

 consider whether it is in the best interests of the juvenile to terminate parental

 rights.” (citations omitted)). See also In re Mashburn, 162 N.C. App. 386, 396 (2004)

 (stating that it is improper for a trial court to consider “best interests” testimony

 during adjudication). It is contrary to the statutory scheme to insert the best interests

 determination into the adjudication of whether grounds exist to terminate

 respondent’s parental rights.

¶ 50 In some circumstances, this Court remands for further factual findings when

 the trial court’s findings are lacking. See, e.g., In re C.L.H., 2021-NCSC-

 1, ¶ 20 (vacating and remanding for further proceedings where the trial court’s

 findings did not establish the existence of a child support order enforceable during

 the relevant period); In re R.D., 376 N.C. 244, 264 (2020) (vacating and remanding

 for entry of a new dispositional order where the disposition was premised on a factual
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

finding without record support); In re N.K., 375 N.C. 805, 825 (2020) (remanding “for

further proceedings” where the record did not indicate whether the trial court

complied with the notice provisions of the Indian Child Welfare Act); In re K.C.T., 375

N.C. 592, 602, (2020) (reversing and remanding for entry of a new order “containing

proper findings and conclusions” where the trial court did not find willful intent on

the part of a parent when terminating parental rights pursuant to N.C.G.S. § 7B-

1111(a)(7)); In re K.R.C., 374 N.C. 849, 865 (2020) (vacating and remanding for the

entry of additional findings and conclusions where “the trial court erred in its failure

to enter sufficient findings of ultimate fact and conclusions of law” to support its

dismissal of a petition for termination of parental rights); In re K.N., 373 N.C. 274,

284–85 (2020) (vacating and remanding for further proceedings, “including the entry

of a new order containing appropriate findings of fact and conclusions of law on the

issue of whether grounds exist to support the termination of respondent’s parental

rights” where the trial court’s adjudicatory findings were insufficient but the record

contained evidence that could have supported the trial court’s conclusion that

termination was appropriate); In re N.D.A., 373 N.C. 71, 84 (2019) (same); Coble v.

Coble, 300 N.C. 708, 714–15 (1980) (vacating and remanding for further evidentiary

findings where findings did not establish that plaintiff was in need of financial

assistance from the defendant but where evidence in the record could support such

findings in an appeal from an order requiring defendant to provide partial child
 IN RE G.B., M.B., AND A.O.J.

 2021-NCSC-34

 Earls, J., dissenting

 support); see also In re K.H., 375 N.C. 610, 618 n.5 (2020) (suggesting that the proper

 disposition is reversal rather than remand where the Court does “not find such

 evidence in the record . . . that could support findings of fact necessary to conclude

 that” a respondent’s parental rights are subject to termination under grounds

 identified by the trial court). The significance of these cases here is the strong

 precedent they set contrary to the notion that this Court can fill in the gaps when a

 trial court’s order fails to make the required factual findings to support termination

 of parental rights.

¶ 51 The United States Supreme Court has recognized that parenting is a

 fundamental right. See Troxel v. Granville, 530 U.S. 57, 66–67 (2000); Santosky v.

 Kramer, 455 U.S. 745, 753 (1982). For that reason, due process requires that a “clear

 and convincing evidence” standard of proof is required in order to “strike[ ] a fair

 balance between the rights of the natural parents and the State’s legitimate

 concerns.” Santosky, 455 U.S. at 769. Here, the trial court did not make adequate

 findings of fact based on that standard of proof, and this Court should not make its

 own findings. Respondent-father should not, in North Carolina, have his parental

 rights terminated merely because of his incarceration. The instant case is not one in

 which the trial court’s findings justify severing the constitutionally protected bond

 between parent and child. I respectfully dissent from the majority’s decision to affirm

 the trial court’s order as to respondent-father.